**SUN OIL CO. v. THE CREE et al.**

**JAMES McWILLIAMS BLUE LINE, Inc., v. SAME.**

**THE PASSAIC SUN.**

**THE CREE.**

**THE THOMAS A. FEENEY.**

**THE HYGRADE NO. 14.**

**Nos. 16118, 16023, 16026, 16037.**

District Court, E. D. New York.

March 3, 1942.

534

Duncan & Mount, of New York City (Henry W. Dieck and Wilbur H. Hecht, both of New York City, of counsel), for Sun Oil Co.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for the tug Cree and the tank barge Hygrade No. 14.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for the tug Thomas A. Feeney and James McWilliams Blue Line, Inc.

ABRUZZO, District Judge.

These four suits arose out of two collisions which occurred at about 5:00 p.m. on December 27, 1939, in the Kill Van Kull, in the vicinity of Newark Bay.

One action was instituted by the Sun Oil Company, owner of the motor vessel "Passaic Sun", against the tugs "Cree" and "Thomas A. Feeney". The second suit is by the James McWilliams Blue Line, Inc., as owner of the tank barge "Blue Line No. 103", against the tugs "Cree" and "Thomas A. Feeney". In the third cause of action, the libellant, Motor Tug Cree, Inc., owner of the tug "Cree", has brought suit against the tug "Thomas A. Feeney" and James McWilliams Blue Line, Inc. In the fourth case, Tanker Hygrade No. 14, Inc., owner of the tank barge "Hygrade No. 14", is suing the tug "Thomas A. Feeney" and the tug "Cree".

For clarity and brevity, the respective parties will hereinafter be designated as the "Passaic Sun", the tug "Cree", the tug "Thomas A. Feeney", the tank barge "Blue Line No. 103" and the tank barge "Hygrade No. 14".

The tug "Cree", with the light oil barge "Hygrade No. 14" on its port side, was proceeding from Bayonne, New Jersey, westward through the Kills. The tug "Thomas A. Feeney", with a loaded oil barge on each side, the "Blue Line No. 103" on her port side and the "Rockland No. 1" on her starboard side, was navigating eastward through the Kills. The tanker "Passaic Sun", loaded, bound from Newark to Peekskill, New York, entered the Kills, intending to continue through that water toward New York, and took up a position behind the tug "Thomas A. Feeney", eastbound.

While in the positions just outlined, a collision occurred between the tow of the "Thomas A. Feeney" and the tow of the "Cree". The starboard forward corner of the barge "Blue Line No. 103" on the "Feeney's" port side collided with the port side of the barge "Hygrade No. 14" about two feet forward of the latter's stern. The impact caused the lines between the "Hygrade No. 14" and the "Cree" to part, throwing that flotilla out of control. Before the "Cree" could recover her tow, another collision ensued between the port bow corner of the "Hygrade No. 14" and the port bow of the "Passaic Sun". Summarizing the incidents which transpired, the first

collision is claimed to have damaged the "Blue Line No. 103" in tow of the "Feeney", the tug "Cree" and her tow, "Hygrade No. 14"; while the second accident caused damage to the motor vessel "Passaic Sun" and to the port bow of the "Hygrade No. 14". It will be noted that the barge "Rockland No. 1" sustained no damage and is not concerned in this litigation.

These collisions happened at about dusk when it was yet possible for the vessels to be discernible to one another. It is conceded that all of the vessels had proper lights and that the tugs "Cree" and "Thomas A. Feeney" had exchanged one-whistle signals.

From the resume of the circumstances involved in these two collisions, the problem of establishing responsibility appears to be somewhat complicated. It is inescapable, however, that the "Passaic Sun" is entitled to compensation for her damages from some one inasmuch as she was an innocent victim of the collisions. From whom the "Passaic Sun" shall recover depends upon where the responsibility lies for the first collision.

Indubitably, the accident between the two of the "Thomas A. Feeney" and the "Cree's" tow must have resulted in one of three ways:

1. The "Thomas A. Feeney" either was not or failed to remain on her starboard hand (viz., southerly or Staten Island) side of the channel.

2. The "Cree" either was not on or failed to remain on her own starboard hand side (viz., northerly or New Jersey side) of the channel.

3. Each of the vessels was close to the middle of the channel and each failed to move sufficiently to her own right, although observing that the other was not doing so.

It must be borne in mind that it was still light enough for each of the vessels, the "Cree" and the "Thomas A. Feeney", to observe one another while in the narrow channel. The testimony indicated that the channel is from four hundred fifty (450) to five hundred (500) feet in width. The spread of the two tows being about two hundred (200) feet, it can be reasonably assumed that approximately three hundred (300) feet remained in which the tows could be navigated with a margin of safety.

Thus, it becomes necessary to scrutinize the testimony adduced before the Court in order to determine whether the "Thomas A. Feeney" is solely responsible for the damages sustained; whether only the tug "Cree" is liable for causing the collisions; or whether both vessels are partially responsible. Should it prove that the "Thomas A. Feeney" was at fault, that vessel will be liable for full damages; and conversely, should the "Cree" be held responsible, she will be compelled to compensate for all the damage incurred. If the testimony indicates that both vessels were at fault for the collisions, then, the damages will be apportioned.

Before analyzing the testimony given by the several witnesses, it is obvious and it has been established by all the parties herein that the Kill Van Kull is a narrow channel. Therefore, the rule applicable to the existing circumstances is expressed in Title 33 U.S.C.A. § 210, which provides: "In narrow channels every steam vessel shall, when it is safe and practical, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

From the evidence, it is manifest that both the "Thomas A. Feeney" and the "Cree" agree that each of them could have kept to her own starboard side of the channel; and if each of the vessels had done so, the first collision would not have occurred for there was ample space for each of them to pass one another port to port.

At the trial of these cases, Captain Myers, master of the "Cree", testified as follows:

"Q. Did you see this 'Passaic Sun'? A. He was about between Buoy 5 and Bergen Point Ferry.

"Q. How far behind the 'Feeney' was he when you first saw him? A. About 700 feet, when I first saw him.

"Q. What did the 'Feeney' do? A. Just kept on his course.

"Q. If you both kept your course that way nothing would have happened, is that right? A. Well, yes, if we kept the course first off.

"Q. If you kept the course as you saw it 1500 feet away, nothing would have happened? A. No.

"Q. Tell me what happened to disturb the situation? A. Then in a couple of minutes, I happened to look over that way

and I seen him showing his green. Then I sheered off a little more and then sheered on.

"Q. When you say you sheered off and sheered on, what do you mean by that? A. That is going zigzag."

From the foregoing, it would seem that the "Cree" did not keep to her original course but sheered off and on, that is, zigzagged.

There is a marked discrepancy between the testimony given by the master of the "Cree" before this Court and that which he attested to before the United States Local Inspectors. Relating to the statements given to the Inspectors, the record at pages 52 and 53 discloses the following:

"Q. Do you remember this question— 'In other words, there is no question that the collision with the "Passaic Sun" occurred on the Staten Island side of the channel?' A. That is right.

"Q. Now, do you remember these questions—'Q. At what point was it that you blew the alarm signal? You say you blew alarm signals to him, to the "Passaic Sun". How soon after the collision did you do that? And the answer was "As soon as the lines parted." Q. Where was the "Passaic Sun" at that time? A. About in line behind the "Feeney".' A. Yes."

This places the "Feeney" on her starboard side of the channel at the time of the collision. The witness, Alphonse Stuke, corroborated this fact when he stated:

"Q. All the tows coming up there hug over by the black buoy? A. Yes.

"Q. That is where you saw the 'Feeney'? A. Yes."

Eugene Freeman, mate and pilot of the tug "Thomas A. Feeney", gave the following version of the collision:

"I was coming down the Kills and I passed about, oh, I should say 60 or 70 feet off buoy #5 on the Staten Island shore, and then I continued on and I saw the 'Cree' coming up under the Bayonne Bridge. He looked to me to be about in the middle of the channel, or a little more to the Staten Island side. I blew him one whistle and he answered. I held my course, heading right on the bridge abutment on the Staten Island side, and when about midway between the #5 and #3 buoy, his barge seemed to start to slide toward me

with the tide, at a sort of an angle, and I threw my wheel hard right, I could not go much farther, and being a heavy tow she did not act, she was still heading almost on the abutment when his port stern came over and side-swiped or hit the port forward corner of my tow."

"Q. Now we have the tide at this stage of the tide: If you were on the Staten Island half it runs straight and if you were on the New Jersey half of it, there is a set toward Newark Bay, is that right? A. That is right."

Captain Nielson, in charge of the "Passaic Sun", was examined and testified as follows:

"Q. And at that time, how far was your ship from the point where the collision between the 'Feeney' and the 'Cree' took place? A. Three or four hundred feet.

"Q. Where was the 'Passaic Sun' in the Kill van Kull at the time that the 'Cree's' barge hit you? A. We were about one hundred or two hundred feet east of the Can Buoy No. 5. Can Buoy 5 was right off our stern when we had the collision."

"Q. If they are going toward New York, they will hold as close as they can to those black buoys? A. Yes, but there was no coal tows.

"Q. And especially that Black Buoy No. 3 they usually have that close aboard their starboard side? A. Yes."

"Q. How far north of the Black Can Buoy No. 5 were you? A. About 150 feet. At the time of the collision you mean?

"Q. Yes. A. About 150 feet.

"Q. Had you swung around so that you were heading into the Kills? A. Yes, sir.

"Q. You were almost straightened out in the Kills? A. I was heading right behind the tow 'Feeney'."

"Q. Could you say how far the 'Feeney' was from the buoys on the starboard side of the channel? A. We were laying right alongside Can Buoy No. 5 so she must have been laying right up close to the shore.

"Q. You could not see that? A. No.

"Q. Do you want to testify that the starboard side of her tow was right up to the buoy? A. No, but she must have passed the buoy very close when she passed Can Buoy No. 5."

"Q. At the time of the collision between the two tows where was your boat? A. So far over as we could come, right close to the bank.

"Q. At that time, did you observe the collision between the tow of the 'Cree' and the tow of the 'Feeney'. A. Yes, sir.

"Q. At the time of the collision, which side of the channel in the Kill van Kull was the 'Feeney' on? A. He was on the right hand side of the channel, on the Staten Island side.

"Q. And isn't it a fact that the collision between the tow of the 'Cree' and the tow of the 'Feeney' occurred on the Staten Island side of the channel? A. Yes, sir."

"Q. I suppose when you saw the 'Cree' where you say she was and you saw the 'Feeney' you could see that there was going to be a collision unless the 'Feeney' started going, I mean the 'Cree,' started going over to her own right? A. Yes, sir.

"Q. And the 'Cree' did not go to her right until a second before the collision? A. Maybe four or five seconds or a couple of seconds. It was so short a time—it is only seconds."

That the "Thomas A. Feeney" was on her own starboard side of the channel has been confirmed by the testimony of the master of the "Passaic Sun" as quoted above.

A survey of the chart for the New York, New Jersey and Kill van Kull areas (McWilliams' Exhibit No. 1) shows that the point where the collision took place is between black buoys No. 5 and 3-A. Apparently, the witnesses meant black buoy No. 3-A when they referred to black buoy No. 3.

These black buoys are definitely on the starboard side of the "Thomas A. Feeney". The testimony leads to the conclusion that the "Thomas A. Feeney" was hugging these buoys. However, the "Cree" has advanced the theory that the tidal situation alone could account for the collision, claiming it would set the "Feeney's" tow toward the Jersey shore and toward the "Cree" since the tide at the point of collision sets from Staten Island toward the Jersey shore in the vicinity of Newark Bay. This argument seems untenable since all the testimony places the "Thomas A. Feeney" on her own starboard side of the channel. It is more logical to assume that if the "Cree" zigzagged, as her master testified, this procedure would inevitably carry her toward the "Thomas A. Feeney". Moreover, since it has been fairly established that the "Thomas A. Feeney" was on her own starboard side of the channel at the time of the

collision, it seems evident that the tide did not set her tow toward the Jersey shore and the "Cree".

The proof indicates that the master of the "Cree" did not hold to her own starboard side of the channel and is at fault wholly or partially for the first collision. The Court finds that the "Thomas A. Feeney" was on her own starboard side of the channel as indicated from the believable testimony. This is the side of the channel where the "Thomas A. Feeney" rightfully should have been. It is on this side of the channel (the "Thomas A. Feeney's" starboard side of the channel) where the first collision occurred. It now remains to be determined whether or not the "Thomas A. Feeney" was in any wise partially to blame for this first collision.

The "Cree" contends that in the face of danger a vessel should stop her engines and thus, at least, lessen the force of the blow if not to avoid the collision entirely and this the "Thomas A. Feeney" failed to do. The latter's tow was one hundred ten (110) feet wide and she was about sixty-five to seventy feet from the buoys, taking up about two hundred (200) feet of the channel. She was proceeding at one-half knot per hour against the tide with her engines at full speed. She was heavily loaded and when her master first saw the "Cree" there was enough clearance if each of the vessels held to her course. The pilot of the "Feeney" stated:

"Q. When you first saw the 'Cree' were the boats in position to pass clear of each other if each had held its course? A. They looked to be.

"Q. About how much? A. Plenty.

"Q. How much would you say? A. It is hard to say. If they had both held the same course there should have been room to pass, but not an awful lot, because he was about in the middle of the channel but you still would have had seventy-five (75) or one hundred (100) feet between those.

"Q. When you first saw him you were about 75 feet north of the line of the black buoys? A. Yes.

"Q. Your tow was about 110 feet wide? A. About that."

Under these conditions, the failure of the "Feeney" to stop her engines did not contribute to the causing of the first collision. Even if the "Thomas A. Feeney" had stopped her engines dead, it is impossible to escape the conclusion that the "Hygrade

No. 14" would have come in contact with some other part of the "Blue Line No. 103". It can thus be seen that whether the "Thomas A. Feeney" had stopped her engines or whether she was proceeding at one-half knot per hour would not make any material difference. The Court finds that no fault or liability attaches to the "Thomas A. Feeney". Therefore, the "Cree" is solely responsible for the first collision and is liable for the damages incurred through the second collision.

In the first action in Admiralty No. 16118, the libellant, the Sun Oil Company, owner of the motor vessel "Passaic Sun" is entitled to a decree against the tug "Cree". The libel against the tug "Thomas A. Feeney" is dismissed.

As to the second suit in Admiralty No. 16023, James McWilliams Blue Line, Inc., as owner of tank barge "Blue Line No. 103", libellant may enter a decree in its favor against the tug "Cree". This libel is dismissed as against the tug "Thomas A. Feeney".

The tug "Thomas A. Feeney" and James McWilliams Blue Line, Inc., charterer in possession, claimants in the cause of action in Admiralty No. 16026 are entitled to a decree dismissing the libel instituted by the Motor Tug "Cree" Inc., owner of the tug "Cree".

In the case in Admiralty No. 16037, the libellant, Tanker "Hygrade No. 14", Inc., owner of the tank barge "Hygrade No. 14", is entitled to a decree against the claimant, the tug "Cree". The libel against the tug "Thomas A. Feeney" is dismissed.

Enter decrees in accordance with this decision.